VAN CLEAVE v. LYNCH.

No. 6821.   Decided February 18, 1946.   (166 P. 2d 244.)

See 25 C. J. S., Death, sec. 104; 5 Am. Jur., 613.

*Howell, Stine & Olmstead,* of Ogden, for appellant.

*M. Blaine Peterson* and *Lewis J. Wallace,* both of Ogden, for respondent.

TURNER, Justice.

Respondent recovered a verdict of $10,000 general damages and $345 special damages against defendant, for alleged wrongful death of respondent's son on July 27, 1942. There is no dispute as to the fact the child was killed as a result of an impact with the automobile driven by defendant. Appellant's appeal is predicated on the following principal grounds: (1) That the trial court erred in not directing a verdict in favor of the defendant; (2) that the court misdirected the jury; and (3) that excessive damages were awarded.

The contention that the court should have directed a verdict on the ground that the facts required a finding that the defendant was unable to avoid the collision with the child, is untenable. Counsel argue that the proof shows that the child, Frank Van Cleave, ran into the side of the car driven by Mrs. Lynch; but an examination of such evidence in connection with all other evidence shows that such evidence is not undisputed. Furthermore, the evidence of the defendant, standing alone, would not necessarily require a finding that the child ran into the side of the Lynch car. Nor is the evidence of negligence insufficient to warrant the court in submitting the case to the jury.

While there is a sharp conflict in the evidence in certain particulars, some evidence is undisputed. It is admitted that

the child died of injuries sustained by an impact with a car operated by Annie P. Lynch. She was traveling on Monroe Boulevard in Ogden. This street runs north and south. It is a through street. There is a blinker signal overhead at the intersection of 23rd street and also stop signs, which require traffic on 23rd street to come to a full stop. The Van Cleaves resided two houses east of Monroe, at 806 23rd street. Four houses farther to the east at 836, on the north side of the street, defendant and her husband resided at the time of the fatal accident.

At 4:56 p. m. on that day a fire siren was heard in the neighborhood. A fire occurred just two blocks away. Deon, a brother of decedent, 9 years of age, with a companion, ran westerly across Monroe toward the place of the fire, but they turned around and started back upon learning that the fire was out before they could get there. Deon testified, as they neared Monroe, going east and walking on the north sidewalk of 23rd street, that he saw his brother Frank go west toward Monroe, then stop and look in both directions, and then start across Monroe. Deon said that he saw a car going north on Monroe and in entering the intersection the driver swerved toward the east and made an arm signal for a right turn by extending the arm upward, getting close to a truck which was stopped on the east side of the intersection and then proceed north again. His brother Frank disappeared from sight, and Deon hurried to the corner, and then saw his little brother in the street. He ran to the house and informed his mother.

A neighbor, who lived directly across the street from the Van Cleave home, was out on her front porch. She testified that she saw Deon and his friend run west across Monroe at the time of the fire alarm. Some minutes later, she saw Frank come out of his home, run westerly along the walk toward Monroe, then stop at the curb, then take one or two steps into the street, when her view was suddenly obstructed by a large truck which went west and stopped at the northeast corner of the intersection. She observed the Lynch car go north at a speed of about 35 miles per hour,

according to her estimate; saw the Lynch car veer easterly toward the truck, and she then heard a noise which she thought was a collision between the Lynch car and the truck she had seen stopped at the said intersection. When the truck moved westerly she saw Frank lying in the street a few feet from the curb on Monroe, about 35 to 40 feet north from the cross-walk. She immediately ran over to see the child.

Another neighbor testified that she had left the Jackson grocery and reached the southwest corner of Monroe and 23rd street, when she saw Deon and his companion going east near the northeast corner of the intersection. She saw Frank over on the northeast corner of the intersection, and heard the child yell, "Stay back," to the boys across the street. She then turned the corner and was going south, when she heard a crash. When she turned around she saw the Lynch car going north. Someone exclaimed, "A little boy got hurt." She rushed over to the scene and saw the child lying near the curb. A truck had driven from the east side of the street, behind the Lynch car, and a man got out. That was the first time she had seen this particular truck, and she did not know from which direction it came. She saw Mr. Lynch get out of the Lynch car and come back.

The plaintiff, father of the deceased child, testified that several days after the accident he had a conversation with the husband of the defendant in the presence of defendant, in which Mr. Lynch stated that he saw the child's head strike the radiator grill; that the body of the child struck the front end of the car so that the straps of metal which hold the license plate were knocked loose. The child's mother testified that Mrs. Lynch declared that she did not see the child until she hit him. The child was wearing overalls.

Defendant called a neighbor who lived on the east side of Monroe about 250 feet north of 23rd street. He testified that he was out on his lawn and happened to be looking south when he saw the Lynch car come north at a moderate speed some distance out from the curb and that he saw a little boy run toward Monroe along the sidewalk and then veer

across the lawn and out into the street about 15 feet north of the cross-walk, and run into the side of the Lynch car. He then ran into his house and called the police. It was about 2 or 3 minutes between the time he went into the house and came out again. He did not go over to where the boy was lying in the street. There was a large crowd around when he came out. The boy was lying within 10 to 20 feet of where the Lynch car was parked. There are 8 or 10 trees between the sidewalk and the curb south of his home. He admitted that he did not have a clear unobstructed view.

The man who administered first aid to the boy was painting a house on the west side of Monroe about a half-block north of 23rd street when he heard a noise and turned around and saw a child curled up about 12 to 15 feet from the curb about 40 feet north of the northeast corner of the intersection. He did not see the collision, but he heard the noise. He did not see the car immediately, although later he saw it pointed over toward the curb some little distance to the north.

The police officer who investigated testified that he found the Lynch car about 200 feet north of the intersection when he arrived. He found a couple of small scratches on the right front fender directly in front. He observed no other dents or marks. No one was in the car at the time. He talked to Mrs. Lynch shortly after the accident and she told him that when she saw the boy he was "right square up in front of the car" and that "he darted out so quickly" that she did not have a chance to see him. He examined the street and found no tire nor skid marks.

The proprietor of the Jackson market testified that he was driving his truck east on 23rd and stopped at the southwest corner of the intersection until the cars going northward had passed. That when a gray car (later identified as the Lynch car) passed he drove easterly into the intersection; he then noticed something fall off the running board of the Lynch car. He observed that it was a child. He turned around and went north on Monroe; then took Mrs. Lynch home—walked home with her. He noticed the child's

body was a couple of car lengths to the south of the point where Mrs. Lynch had parked the car. He did not recall seeing any truck at the intersection on the east side. Three cars passed through the intersection before the Lynch car passed in front of him. He had been acquainted with defendant since childhood; visited socially with Mr. and Mrs. Lynch, and also looked after her following the accident because of her nervous condition. He did not notice any boy in the Lynch car. He looked northward over his shoulder when he reached the east pedestrian lane. He did not see the child run into the car, and he did not see the child come into contact with the car.

Defendant testified that she picked up her husband after work, and that their nephew, about 10 years of age, was with them. They were driving him home. She testified that she did not turn east on 23rd street to go to their home because she was taking her nephew home first; that she gave no hand signal at 23rd street, and that she was going 20 to 25 miles per hour. The nephew watched the speedometer. As she came to the intersection she saw Mr. Jackson's truck stopped at the southwest corner of the intersection. She did not see the Van Cleave boy at all. She felt no jar and heard no noise until she heard her husband scream. She stopped the car and Mr. Jackson came over to her a few minutes later. She stated that as she entered the intersection her eyes were directly ahead, on the pavement. This was the way she usually traveled to go home, but she did not give the customary signal to turn east on this occasion because she was not going directly home. Furthermore, she stated that she did not see any car stopped at the northeast corner of the intersection; that she knew she was "protected from that corner" by a stop sign. She said she would not say whether there was a truck there or not, but she saw Mr. Jackson's truck over at the southwest corner. She saw no small boys on the northwest corner, but she always watched out for children because she knew they played around there. She admitted that she would have had an unobstructed view of the northeast corner, if she had looked.

Defendant declared that she stopped a few feet after her husband screamed; then drove over to the curb. She screamed when the boy's mother said, "You have killed my child." Her husband jumped out of the car the first time it stopped. She knew something had happened, but she did not see the boy. When her husband screamed, he might have said something about a child or a boy, although she could not remember just what he did say. She denied telling the officer that she saw the boy in front of the car, or that she declared that she saw the child. She testified that the mother of the child stated that it was an unavoidable accident. She denied that she changed her course in any manner as she entered the intersection. After she got through the intersection, she noticed a dark car parked at the east curb on the north side of the fire-hydrant about 35 or 40 feet north from the sidewalk of 23rd street.

Mr. Lynch testified that he saw the Jackson truck stopped at the southwest corner at the stop sign. The Lynch car was about 15 feet from the east curb going north, and he did not observe any change in its course. He did not notice any arm signal for a turn at 23rd street, but he did not look for a signal. The first time he saw Frank Van Cleave was when he saw his head in front of the right hand side of the car. He did not notice the direction from which the boy came. He saw the child's head strike the front fender and go over the fender and hit the side of the car, and he raised his hands and exclaimed, "there is a kid hit the car." Defendant stopped the car in about two car lengths after the impact. When he ran back he saw the child lying on the pavement, in front of the parked car about 6 or 8 feet. He admitted that the child's father made inquiry as to how the accident occurred, but he denied stating that the car hit the child. He testified that he told Mr. Van Cleave that the boy ran into the car.

While counsel argue that there is no evidence of negligence on the part of the defendant, the fact picture as given by certain witnesses shows negligence. It is true that *some* witnesses testified that the child ran into the car, including

defendant's husband. The man down the street did not have an unobstructed view. Her husband did testify that he saw the head of the child in *front* on the right side, and that he saw the child's head strike the front fender and go over the fender and hit the side of the car, although he declared that the boy ran into the car. Defendant admitted that she would have had an unobstructed view of the intersection to the east if she had looked. Failure to watch out for children whom she said played at that intersection at times, might amount to lack of a proper lookout and want of careful and prudent observation of conditions of the intersection. The jury might well have believed that if she kept her eyes "straight ahead" she was not alert for pedestrians moving across the street from her right. Furthermore, the fact that the child was found 35 or 40 feet north of the cross-walk would not require a conclusion that he was attempting to cross the street at a point north of the cross-walk, for defendant's own witnesses testified that the child rolled over the fender and off the running board, so that the movement of the car could very easily have carried the child that far north of the cross-walk in 2 or 3 seconds. Defendant's own testimony that she saw a car parked about 35 feet north of the cross-walk would not require a conclusion that the child entered the street north of such car. The theory of defendant that the child suddenly darted into the street either at a point north of the parked car so that his movement could not be seen, or that he ran into the side of the car, or did both, was not established or proved by evidence which required the jury to make such a finding.

Defendant was in the habit of turning east on 23rd street. The older brother Deon stated that he saw defendant make a signal for a right turn and turn toward 23rd street and then turn back and drive northward. This testimony is corroborated by that of a neighbor who testified that the Lynch car veered toward the east so close to the large truck stopped at the northeast corner of the intersection that when she heard the noise she thought that the Lynch car had collided with the truck. The jury might well have

believed this testimony, and have concluded that defendant made a signal for a turn, and upon remembering that she was going to take her nephew home first, suddenly changed her course so that she got close to the truck and close to the east curb. If the child yelled to the boys across the street to watch out, and saw the arm signal for a turn, he might well have proceeded westerly across the cross-walk, relying on such signal, only to be struck down when the car changed its course and when it became impossible for him to get out of the way.

The jury was not arbitrary in finding defendant guilty of negligence, even in view of her own testimony and that of her witnesses. The mere fact that she did not see the child, if in the process of observation she could have seen, would not make her conduct free from negligence. If the jury believed that the child was struck by the front of the car, which the jurors had a right to believe from competent evidence, the manner in which defendant drove her car could have been deemed the proximate cause of the impact—the signaling for a right turn to lead the decedent to believe it was safe to cross to the west, and the sudden change of course. There was ample evidence to support the findings of the jury. The record clearly shows that the evidence is such that reasonable minds could conclude that defendant had ample opportunity to observe the child, that she was inattentive nothwithstanding she had a clear view; that she started to turn to the right, and then suddenly changed her mind when it was unsafe to do so. Drivers are under a duty to exercise reasonable care to avoid injuring children, who come into the street. *Waterbury* v. *Elysian Spring Water Co.*, 139 Cal. App. 355, 33 P. 2d 1048; *Wong Kit* v. *Crescent Creamery Co.*, 87 Cal. App. 563, 262 P. 481; *Lee* v. *Independent Dairy*, 127 Wash. 622, 221 P. 309.

A driver of a vehicle is not excused from responsibility when he does not see that which, by the exercise of proper caution and observation, he should have seen. *Moore* v.

*Bishop*, 113 Cal. App. 25, 297 P. 580; *Gannon* v. *Keil*, 252 Ill. App. 550; *Knapp* v. *Sommerville*, 196 Wis. 54, 219 N. W. 369; *Barker* v. *Savas*, 52 Utah 262, 172 P. 672; *Kuehne* v. *Brown*, 257 Pa. 37, 101 A. 77. Whether a driver should have seen the child in time to avoid collision with the child, is a jury question. *Barker* v. *Savas*, supra.

Appellant complains that certain instructions given by the trial court constituted prejudicial error by reason of lack of evidence to warrant them. The record shows there is competent evidence to support such instructions. If the evidence were only according to defendant's theory of the happening of the accident, there would be merit to these particular assignments of error, but as we have pointed out above, there was sufficient competent evidence of negligence of appellant as the proximate cause of the death of Frank Van Cleave to take the case to the jury. Instructions covering respondent's theory of the case were properly given. *Webb* v. *Snow*, 102 Utah 435, 132 P. 2d 114.

Counsel complains particularly of the following portion of an instruction given relative to the measure of damages for loss of a minor child by negligence of one sued:

"* * * and in determining this amount you should take into consideration the earnings of the boy, if any, or his prospective earnings, less the expenses which you find plaintiff might reasonably have expected to receive and any and all financial aid and support which you find that he might reasonably have expected to receive from such boy had he lived, whether as a minor or after he had reached his majority. You may also consider the length of time which the child and the parent might reasonably be expected to live. You should also take into consideration the financial loss to the plaintiff of the boy's comfort, society and companionship."

It is argued that there was failure of proof as to earnings or earning capacity of the child, and that the evidence is therefore insufficient to sustain any verdict except for nominal damages. There is evidence that the child was a bright, healthy, and affectionate boy 6 years of age. The contention that recovery would have to

be limited to his earning capacity is without merit. The instruction correctly permits the jury to compensate for the loss of the boy's comfort, society and companionship. The law relating to damages for loss of a minor child is well stated in 16 Am. Jur. p. 228, sec. 337:

"It is not feasible to set out in detail the exact evidence which will be sufficient to entitle the parents to recover substantial damages for the death of a child. In general, however, it may be said that it is sufficient in this regard to show the age, sex, health, and disposition of the deceased if a young child; in the case of the death of older children, this evidence is also sufficient where supplemented by evidence of the earnings or earning capacity of the child and his character and disposition to aid his parents. This does not mean, however, that evidence of the earnings of a child killed by wrongful act is essential in all cases to a recovery of substantial damages."

In *Beaman* v. *Martha Washington Mining Co.*, 23 Utah 139, 63 P. 631, this court held that recovery by a parent for pecuniary loss sustained in being deprived of the society, comfort and protection of the child is not necessarily limited to the period of the child's minority; and in *Sweeten* v. *Pacific Power & Light Co.*, 88 Wash. 679, 153 P. 1054, it is held, as stated in the syllabus:

"In an action for the death of a bright, healthy child, eight years of age, the jury may estimate the pecuniary loss and award substantial damages without direct evidence of the probable value of his services had he lived to majority."

In *Rekdahl* v. *Cheney*, 134 Or. 251, 293 P. 412, it was held that in an action for wrongful death of a nine year old boy, the case should be submitted to the jury on the question of damages, nothwithstanding there was no showing of earning capacity. The court's instruction is also supported by *Rishworth* v. *Moss et al.*, Tex. Civ. App. 191 S. W. 843, and *Atkeson* v. *Jackson Estate*, 72 Wash. 233, 130 P. 102, at page 105, wherein it is stated:

"There is, of course, no certain measure of damages in cases of this character; but, notwithstanding this difficulty, the great weight of authority is that a substantial recovery may be had."

We quote further from the same opinion:

"Where the child killed is of tender years, proof of special pecuniary damages is not necessary to maintain the action or warrant a recovery for more than nominal damages."

We are in accord with the foregoing quoted propositions. We believe the weight of authority supports them. The theory that a parent should receive compensation only for actual loss of earnings of a child killed by the negligent acts of another, has not only been obliterated by time and social changes, but by sound reasoning. Since a right of action is granted for wrongful death, if mere earning capacity were the criterion for measuring the amount of recovery, then in the case of the wrongful death of a hopelessly crippled child through the negligence of a defendant it could be claimed with some semblance of reason that no recovery at all should be allowed, because the parent bringing the suit would be better off financially as a result of the death by being relieved of the obligation to support one who would always be financially dependent. While children still frequently contribute to the support of their families, their status in society cannot be measured merely in terms of what they are able to do for the financial aid of their parents. In many cases the cost of rearing children far exceeds all possible earning capacity. Nevertheless, children are sought, not for their financial possibilities, but for love, companionship and happiness which transcend all financial considerations.

In the final analysis there is no actual quid pro quo for wrongful death. The loss of a loved one cannot be measured with any degree of exactness, although the right of action granted for wrongful death provides indemnity only in terms of money. While earning capacity is some cases might be an important element, it is not the only element; and as a relative matter, it may shrink in importance as the age of the person is considered either by reason of greatly advanced age or by childhood when earning capacity is absent. While the instruction given in this

case relative to measure of damages is not a model instruction and does not entirely accord with our views, we conclude that there is no reversible error.

We have examined other instructions of which complaint is made on some ground. We have also examined the instructions given, in the light of instructions requested which appellant claims should have been given. It appears to us that the court instructed the jury on all the theories presented. The contention that the jury did not receive adequate or proper instructions, is without merit. See *State Bank of Beaver County* v. *Hollingshead,* 82 Utah 416, 25 P. 2d 612.

The final contention urged by appellant is that the judgment should be vacated by reason of the fact that the jury awarded excessive damages, and that there is no precedent in this state for $10,000 general damages for death of a child as young as decedent. It is true that in the *Beaman case,* supra, the trial court reduced to $6,000 a verdict of $10,000 returned for the wrongful death of a boy sixteen years of age. In *Corbett* v. *Oregon Short Line R. Co.,* 25 Utah 449, 71 P. 1063, 1065, the jury awarded $15,100 for the death of a child 2½ years old. This was reduced by the trial judge to $6,100, and affirmed by this court. In *Jensen* v. *Denver & Rio Grande R. Co.,* 44 Utah 100, 138 P. 1185, the jury awarded $7,620 for a 14 year old boy, and the verdict was upheld. The argument of counsel loses its apparent potency when reference is made to the dates of the cited decisions, 1901, 1903, and 1914. The purchasing power of the dollar has greatly decreased since the dates of those decisions. This fact is so well known that we can take judicial notice of it.

Considering present-day purchasing power, an award of $10,000 general damages and $345 special damages cannot be regarded as excessive, particularly in view of various decisions of more recent date. See *Black* v. *Peerless Elite Laundry Co.,* 1933, 113 W. Va. 828, 169 S. E. 447, where $10,000 verdict was recovered for death of boy less than five years of age; and also *Ashland Sanitary*

*Milk Co.* v. *Messersmith's Adm'r*, 1937, 236 Ky. 91, 32 S. W. 2d 727, where the jury awarded $15,000 for a girl 10½ years of age. In *Ellis* v. *Ashton & St. Anthony Power Co.*, 1925, 41 Idaho 106, 238 P. 517, an award of $10,000 was upheld. In *Autio* v. *Miller*, 1932, 92 Mont. 150, 11 P. 2d 1039, there was a verdict of $15,000 for the death of a boy 8 years of age.

The judgment of the district court is affirmed. Costs to respondent.

LARSON, C. J., and McDONOUGH, WADE, and WOLFE, JJ., Concur.