## WILSCAM et ux. v. UNITED STATES.
### Civ. No. 789.

District Court, Hawaii.
March 24, 1948.

582

Edward Z. Buck, of Honolulu, Hawaii (Lewis, Kimball & Buck, of Honolulu, Hawaii, of counsel), for plaintiffs.

Ray J. O'Brien, U. S. Atty. District of Hawaii, and William M. Blatt, Asst. U. S. Atty., District of Hawaii, of Honolulu, Hawaii, for defendant.

McLAUGHLIN, District Judge.

This is a suit under the Federal Tort Claims Act, 28 U.S.C.A. § 921 et seq., by the parents of a deceased minor to recover damages in the sum of $20,000 for the child's death alleged to have been caused by the negligence of an employee of the Government.

Findings of Fact

From the evidence, I find the following to be the facts:

1. Mr. and Mrs. C. J. Wilscam were the lawful parents of Raymond J. Wilscam, the minor, who was born September 3, 1942, and who died at the Naval Dispensary, McGrew Point, Oahu, Territory of Hawaii, on August 27, 1946.

2. The child's father being a chief warrant officer (pay clerk) of the United States Navy, pursuant to Navy Regulations No. 1185 the child was entitled to receive medical care and treatment by the Navy. Having been born with weak muscles in his right eye, long prior to August 1946 the child was examined and prescribed for as to that defect by various naval eye doctors from time to time.

3. In December 1945 a Navy doctor prescribed glasses for the child and advised the parents that eventually an operation to correct the deficiency of the muscles in the crossed eye was advisable. The child's other eye was normal.

As the Navy did not at that time provide the services of an optician, the father had the prescription for the child's glasses filled in Honolulu by a civilian optician.

Unfortunately, but with no permanently harmful effects, in filling the prescription the civilian optician inadvertently so put the proper lens for the crossed eye in the frame that it served the good eye.

Being unaware that the optician had reversed the lens but noting the child's discomfort, upon learning in August 1946 that at the Aiea Naval Hospital the Navy had an excellent woman eye specialist on the staff, the father took the child to this doctor.

4. It was this Navy doctor who, on August 21, 1946, upon examining the child and his glasses, discovered that the person filling the prescription for glasses had reversed the lens.

This doctor, being a specialist particularly with respect to children's eyes, advised the father that an operation upon the defective eye muscles was in order, and as preliminary to the further consid-

eration of such an operation correctly prescribed proper medication to dilate the child's eyes to be administered, as directed, by the parents. After the drug had been thus applied the child was to be brought back for a more detailed examination by the doctor while the child's eyes were dilated.

5. The prescription dictated by the doctor to the nurse and by her given to the father called for a one-half of one percent solution of atropine sulphate. The accompanying directions stated that one drop was to be put in each eye three times a day for three days prior to the next appointment with the doctor, which was made for August 30 at 9:00 a. m. August 27 was thus the first day for the application of the drug to the child's eyes.

6. The father took the doctor's prescription to the pharmacy in the Aiea Naval Hospital, called the Fleet Service Dispensary, United States Navy, and gave it to a corpsman, who—possibly assisted by another corpsman then also on duty—attended to the order by compounding a drug and gave the father a small bottle containing a nearly colorless liquid labeled: Prescription No. 14225, Aiea Naval Hospital, Donovan (Name), nurse corps by instruction of Lt. Comdr. F.B. Richman (M.C.) U.S.N.R. (Doctor's name), Wilscorn, R.J., ½% solution atropine—one drop, each eye 3 times a day for 3 days.

Nothing upon the bottle or on or by way of a label gave any warning of the contents being a poison.

Despite the corpsman misspelling the father's name on the bottle label, it was the prescription ordered and waited for and delivered to him personally at the Aiea naval pharmacy. Indeed, a prescription filled at the same place in 1945 also misspelled the father's name in like manner, and it appears that his odd name is often misspelled.

7. Presuming, and without reason to think otherwise, that the corpsman had properly filled the doctor's prescription, the father took the child and the medicine home, and delivered both to the mother. At no time did the father open or in any way interfere with the contents of the bottle given him by the corpsman as prescription No. 14225, but delivered it to the child's mother just as it was given to him at the hospital. The father informed the mother as to what the doctor said regarding the child, the medicine, and the next appointment.

8. The mother received the child and the medicine and understood the directions, for she had many times previously had occasion to administer drops to the child's eyes so a doctor could examine them.

To keep the medicine safe and away from harm, the mother put the small bottle of medicine upon a high shelf in the living room. She placed it thus because she was downstairs when the father brought the boy back from the doctor, so she would remember to use it on the prescribed dates, and so neither the child nor his older sister could get at it. The medicine remained there untouched by anyone until August 27. The plaintiffs kept no patent medicines or household poisons in the house at any time.

9. On that date (August 27) at about 8:00 a. m., the mother went to the shelf above described, took the bottle of medicine bearing the prescription number above stated from the place where she had put it on August 21, went upstairs where the child was, placed Raymond on the bedroom floor face up, and as directed dropped with the applicator one drop of the contents of this bottle into each of the child's eyes. Before doing so she tested the accuracy of the dropper by dropping drops from it into the bottle, and as she applied the medicine to the child's eyes she held the bridge of his nose, in accordance with previously prescribed doctor's instructions. Thereafter she placed the bottle on the shelf of her bedroom closet and placed the child in her bed.

10. Upon taking the child to bed, he started to cry and soon felt feverish. Then his actions were jerky, he stared, cried, moaned, and later stopped crying.

At this point the father returned from work to remind the mother that it was the day to start administering the drops. See-

ing the child in the condition above indicated, he became alarmed. The mother said other doctors had said a child having drops might be upset and not to be worried, so the father returned to work.

11. Being, however, excited about the child's condition, upon returning to work at the commissary the father phoned the prescribing doctor, described the situation, telling the doctor that the child was hot and kicked his legs and waved his arms as if in a tantrum. The doctor told the father to give the child liquids, cold baths and to throw the medicine away. At this latter suggestion the father inquired if he should not send the medicine to the doctor for analysis. The doctor agreed, so the father went home again, told his wife what to do, and took the medicine from the bedroom closet and took it back to the commissary with him. There he gave it to a sailor, L. E. Newill, storekeeper first class, United States Navy, with instructions to take it at once to the doctor at the hospital, which the sailor did, promptly delivering it just as it was given to him to the doctor personally.

12. The doctor at Aiea Naval Hospital—several miles distant—having called the McGrew Point naval dispensary nearer the plaintiffs' home, the doctor in charge thereof telephoned the father and said he was sending the ambulance for the child. The father rushed home again, finding the mother doing as the doctor had advised, but with the child worse and "out of his head." The ambulance arrived and the child was taken to the dispensary about 11:00 a. m. The father obtained permission to remain with the child and did so until he died a few hours later at the dispensary.

13. The doctor attending the child at the dispensary, Dr. Goldthwait, Commander Medical Corps, United States Navy, found the child unconscious when admitted, skin flushed and dry, pupils dilated, the child purposelessly superactive, temperature 102 degrees, pulse 96, and respiration 15. Having been advised that the child had had atropine put in his eyes a few hours earlier, the doctor administered

morphine. The child's temperature later rose to 107 degrees (rectal) and by injections the doctor brought it down to 99 degrees. At 4:07 p. m. a nurse called the doctor stating that the child was having difficulty breathing. The doctor was but about twenty feet away when called but by the time he reached the child's bed the child had stopped breathing, and remedies applied to revive the child proved unsuccessful. The doctor in charge of the dispensary (Dr. Cooper, Captain Medical Corps, United States Navy) was called, and after examining the child pronounced him dead.

14. The liquid contained in prescription No. 14225, two drops of which had been placed in the child's eyes as directed about 8:00 a. m. on the day of his death, when analyzed at Aiea Naval Hospital was found to contain a 31%—repeat 31%—solution of atropine sulphate. This was the same bottle and its contents delivered by the sailor August 27 to Dr. Richman.

15. On August 28 an autopsy was performed upon the child's body by a Navy doctor, and a trace of atropine was found in his bladder.

16. Symptoms of atropine poisoning are: dry mouth and skin, dilated eyes, flushed face, increased temperature, increased heart beat, delirium, restlessness and coma.

Never more than a one percent solution of atropine sulphate is used by eye doctors to dilate a child's eyes and usually a one-half of one percent solution, and though such might possibly cause death, rarely does. Reputable doctors customarily use a one-half of one percent solution to dilate a child's eyes.

Atropine ordinarily is not used by eye doctors in preparing an adult's eyes for examination because of the danger of glaucoma, but customarily is used to prepare a child's eyes for examination, as glaucoma is rare in children. Children's eye muscles are stronger than adults', and unlike other drugs atropine produces the maximum dilation. Thus Dr. Richman followed accepted medical procedures in

prescribing a one-half of one percent solution of atropine sulphate in this instance.

17. A single drop of a 31% solution of atropine sulphate—15 milligrams—is a lethal dose for a human being.

18. The death of the child, Raymond J. Wilscam, at the age of three years, eleven months, twenty-four days, with a life expectancy of 60.58 years, was caused by atropine poisoning and as a direct result of two drops or 30 milligrams of the 31% atropine sulphate solution contained in the Aiea Naval Hospital pharmacy prescription No. 14225 being introduced into his system. The identity of the Navy corpsman or corpsmen who filled this prescription thus is not known, but it is conceded that this prescription was filled by agents of the defendant acting within the scope of their assigned duties.

19. The deceased child's father is now 34 years old and in a year and one half will be eligible to retire from the Navy with twenty years of service at a monthly income of $107 per month. With allowances, his take-home pay now is $400 per month. The mother is 32 years old. These plaintiffs have a girl aged eleven years, and since Raymond's death a new son has been born to them.

20. Burial costs of $185 and a headstone costing $275 were, and each is, found to be reasonable costs.

21. The child's power of sight in his right eye was not perfect, and he would always be in need of glasses. However, aside from this and also the severe crossed condition of his right eye, technically described as a "right concurrent [sic] convergent strabismus of about 50 degrees [maximum] with an overshoot of the right inferior oblique muscle" (Exhibit "B"), the child was otherwise a normal, active, healthy, affectionate child of almost four.

22. The strabismic condition of the child's eye did not affect the power of sight in the eye, but abhorring double vision, nature would throw the power of sight into disuse, and by non-use the power of sight would eventually be lost unless the situation was corrected by glasses or by an operation.

Glasses, however, would have no effect upon the position of the right eye and this was correctable only by an operation upon the eye muscles. Such an operation, involving in Honolulu in 1946 a medical fee of between $150 and $200, plus five to ten days of hospitalization—and in a child the complete correction could be done in one operation—is not a dangerous operation, and at the hands of a good eye doctor the chances of correcting the position of the eye are excellent.

23. It is likely that the child's parents had he lived would have consented to such an operation to correct the strabismic condition in his right eye and that such an operation would have been successful, so that the child would have gone through life wearing glasses but not as a cross-eyed person.

## Opinion

The facts have been stated with more than customary particularization, not alone because of the unusual nature of the case but because the only defense which the Government has is the argument that there exists no positive proof that the contents of the bottle bearing prescription label No. 14225 was the same fluid which the naval pharmacy gave to the father upon the order of said prescription on August 21, 1946.

In fairness to the Government and its representative let it be recorded that no plaintiff could expect greater cooperation from a defendant than was here accorded. It stipulated every material fact except that above indicated, upon which it rests its sole defensive argument with respect to liability.

But upon the issue of causation, introducing no evidence itself to contradict the evidence by which with meticulous care the plaintiffs traced the bottle and its contents from the time received from the naval pharmacy on August 21, 1946, until returned, minus two drops, to the prescribing doctor for analysis on August 27, 1946, the proffered argument that perhaps somebody, such as plaintiffs' eleven year old daughter, changed the contents of

the bottle, is nothing but an attempt to grasp at a straw. The argument is rejected as unfounded and unjustified by the evidence. The plaintiffs' evidence is satisfactory upon the point and it not only rings true, but to have heard the parents testify is to know it is true.

■ Under the common law of Hawaii as most recently expressed by the Supreme Court of the Territory of Hawaii in Gabriel v. Margah, 37 Haw. 571, under facts such as found here a private person would be liable to the plaintiffs in an action by them for damages caused by the wrongful act of the defendant. Thus upon those facts under the Federal Tort Claims Act, the United States is liable to these parents for the wrongful death of their son directly caused by the negligence of one or more of its employees acting within the scope of their employment.

### Conclusions of Law

1. The corpsman or cropsmen on duty around midday August 21, 1946, at the pharmacy at the Aiea Naval Hospital, Oahu, Territory of Hawaii, negligently filled prescription No. 14225 from Dr. Richman, Lieutenant Commander, Medical Corps, U.S.N.R., with a 31% solution of atropine sulphate instead of a one-half of one percent solution of said drug as called for by the doctor's order, and said corpsman or corpsmen were at the time employees of the United States acting within the scope of their assigned duties or employment.

2. Said negligence of the defendant's agents was the proximate, indeed the direct and sole cause of the death of the plaintiffs' child Raymond.

### Damages

The United States being liable, the question of the amount of the damages to be awarded will be treated separately.

Cases such as this not only justify the passage of the Federal Tort Claims Act, but also make a judge wish that Congress had provided for jury verdicts. It no doubt had good and ample reasons for not so providing, and the court must remind itself—as it would instruct a jury—that it must not allow sympathy to interfere with its judgment.

Concededly the plaintiffs presented very unsatisfactory evidence upon the question of damages. From the nature of the case perhaps no more could have been expected. Evidence was introduced, however, to show that the cost of currently supporting a second child in a family of four, with the father the sole source of support, is $500 a year or approximately $40 per month, and that due to his Navy connection it cost the plaintiffs $30 per month to support the child prior to his death. Evidence was also tendered to show the current wage rates in Honolulu for adults, leaving to the court to estimate the current wage rate for minors allowed to work under Territorial law after attaining the age of 16 years. Giving such evidence its best possible application, I find that it helps not at all in arriving at a satisfactory figure.

The Government, of course, presented no evidence on this point, but taking the inadequate data given by plaintiffs, evolves the harsh argument that the child's death benefited the plaintiffs rather than damaged them in that the cost of support would seem to exceed what he might have earned. It is for just such reasons as are reflected by this argument that the law does not make the question of damages in a case of this description turn upon the earning capacity of the minor. Indeed, the rule that parents are entitled to a minor's earnings is archaic and a remnant of times long since past. It does not accord with modern views of the parent-child relationship.

At best the calculation of damages in a wrongful death case is a "somewhat indefinite process," Karr v. Sixt, 1946, 146 Ohio St. 527, 67 N.E.2d 331, 337, and Autio v. Miller, 1932, 92 Mont. 150, 11 P.2d 1039, 1045, and—"The theory that a parent should receive compensation only for actual loss of earnings of a child killed by the negligent acts of another, has not only been obliterated by time and social changes, but by sound reasoning." Van Cleave v. Lynch, 1946, 109 Utah 149, 166 P.2d 244, 249.

It is well settled law with regard to cases of this nature that despite the absence of evidence as to the earning capacity of an infant, there being no certain measure of damages anyway as life is beyond value, substantial damages are nevertheless recoverable in an amount resting in the sound discretion of the trier of fact. Gabriel v. Margah, supra; Van Cleave v. Lynch, supra; 16 Am.Jur., "Death", § 337; and Tiffany, "Death by Wrongful Act," second edition, § 164.

The plaintiffs, accordingly, are entitled to recover substantial damages, despite the lack of clear and convincing evidence of the precise amount of the pecuniary damages caused them by the wrongful act of the person or persons, for whose negligence the defendant is responsible, but of course nothing by way of punitive damages. Punitive damage is not an element in this case, no claim to such is made, and were it made it would not be allowed under the law in this jurisdiction or by the terms of the Federal Tort Claims Act itself.

Taking judicial notice of the current decreased purchasing power of the dollar (Armentrout v. Virginian Railway, D.C.S.D.W.Va. 1947, 72 F.Supp. 997, 1001; Van Cleave v. Lynch, supra, at page 250 of 166 P.2d; Cooksey v. Atchison, T. & S. F. Ry., 78 Cal.App.2d 504, 178 P.2d 69, at page 72; and see also recent cases subsequent to the annotation in 60 A.L.R. 1395), as damages to the plaintiffs, caused as above held, the following amounts are allowed:

1. On account of the loss of the child's earning capacity during his minority, less the cost of maintenance, the sum of $1,000;

2. A sum of $460 to cover the cost of funeral expenses; and

3. The sum of $10,000 to compensate for the plaintiffs' loss of association, comfort, and of the presence of the deceased child.

A judgment in conformity with this decision will, upon notice, be signed upon presentation.