**Linda S. JONES, Plaintiff and Appellant,**

v.

**Paul Michael CARVELL, Defendant and Respondent.**

No. 16753.

Supreme Court of Utah.

Jan. 6, 1982.

M. Dayle Jeffs, Provo, for plaintiff and appellant.

Don R. Petersen, Provo, for defendant and respondent.

STEWART, Justice:

Plaintiff, Linda S. Jones, appeals from a judgment entered on a jury verdict awarding her $10,000 for the wrongful death of her five-year old son, Peter John Carvell, and from the district court's denial of her motion for new trial or in the alternative for an additur. Plaintiff also urges on appeal that the trial court erred in refusing to instruct the jury that damages could be based, in part, on the cost of raising a child to the age of its death and for the amount of money that the mother could have earned had she not remained at home to rear the child. In addition, she contends that the court erred in excluding testimony tending to establish her inability to bear additional children and evidence of Carvell's willful misconduct and intoxication, that defense counsel's closing argument was improper because it went beyond the issues and outside the record.

Plaintiff's five-year old son was killed while riding as a passenger in a car driven by defendant, Paul Michael Carvell, the decedent's uncle. Prior to trial, Carvell ad-

mitted liability. The sole issue litigated was that of damages, and Linda Jones was the only witness. The jury found Jones' damages for the wrongful death of her son to be $9,165.62 general damages, and $834.38 for funeral expenses.

Utah's wrongful death statute, like most other states', was patterned after Lord Campbell's Act enacted in England in 1846. Fatal Accidents Act, 9 & 10 Vict., c. 93 (1846). It was designed to uproot what to us is the shockingly harsh common law rule that "in a civil court, the death of a human being could not be complained of as an injury," *Baker v. Bolton*, 1 Campb. 493, 170 Eng.Rep. 33 (Nisi Prius 1808). English law, however, had not always taken that position. The accidental killing of a human being was a compensible wrong even before the Norman Conquest. Pollock & Maitland, *History of English Law*, i, 48.

The English courts interpreted Lord Campbell's Act to provide for the recovery of "such damages as [the jury] may think proportioned to the injury resulting from such death." Basically, that was construed to mean that only pecuniary, that is, out-of-pocket damages, could be recovered. In cases of the wrongful death of a child, the English courts, at a time when young children labored in the mines and mills of England for the benefit of their parents, interpreted that language restrictively to allow damages only for the amount of money which the child as a result of its labor, less its own expenses and upkeep, would have contributed to the parents. *Blake v. Midland Ry.*, 18 QB 93, 118 Eng.Rep. 35, 42–43 (Q.B.1852).

Various efforts were made by some courts to mitigate the harshness of the rule, especially as conditions changed and children generally ceased to be viewed primarily as producers of wealth, but a number of states in the United States followed the old English pattern and limited recovery to the decedent's expected earnings less living expenses. E.g., *Hanks v. Norfolk & Western Ry. Co.*, 230 N.C. 179, 52 S.E.2d 717 (1949);

*Stratton v. Sioux Falls Traction System*, 55 S.D. 464, 226 N.W. 644 (1929). Annot., *Damages for Infant's Death*, 149 A.L.R. 234 (1944). See also Prosser, *Handbook of the Law of Torts*, 905 (4th ed. 1971).

A wrongful death cause of action was established by the Utah Territorial Legislature in 1874, Ch. 11 [1874] Laws of Territory of Utah 9, II Compiled Laws of Utah § 2961 (1888). The present standard for the determination of damages was enacted in 1884. Laws of the Territory of Utah, Title III, §§ 233, 234; II Compiled Laws of Utah, §§ 3178, 3179 (1888). Indeed, the matter was of such importance at the time of statehood given the general uncertainty of the law, at least in other states, that the framers of the Utah Constitution provided for a judicial remedy by Article XVI, § 5 of the Constitution which states that a "right of action to recover for injuries resulting in death, shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation . . ."

Under present statutory law, the right to sue for the wrongful death of a child is established by Utah Code Ann., 1953, § 78–11–6, and Section 78–11–7, which addresses the nature of recoverable damages and provides that "such damages may be given under all the circumstances of the case as may be just." Unlike wrongful statutes in some other states, Utah statutory law does not limit damages to economic or "pecuniary" losses resulting from a child's death.

▇▇▇▇ Under Utah law a parent may recover for the wrongful death of a child such damages as funeral and medical expenses, cf. *Ottley v. Hill*, 21 Utah 2d 396, 446 P.2d 301 (1968), the value of the services he might have rendered to the household, and the amount of money the deceased child might have earned, if its projected income would have exceeded the cost of its maintenance and care. However, damages are not limited to such losses. *Van Cleave v. Lynch*, 109 Utah 149, 166 P.2d 244 (1946),[1]

---

1. In *Van Cleave v. Lynch*, 109 Utah 149, 161, 166 P.2d 244, 249–50, this Court stated:

The theory that a parent should receive compensation only for actual loss of earnings of a

and this jurisdiction has emphasized from the beginning that the greatest losses arising from the wrongful death of a child are not those losses which are economic in nature. It is the loss of society, love, companionship, protection and affection which usually constitute the heart of the action. *Van Cleave v. Lynch, supra; Evans v. Oregon Shortline Railroad Co.*, 37 Utah 431, 439–440, 108 P. 638, 641 (1910); *Corbett v. Oregon Short Line Railroad Co.*, 25 Utah 449, 71 P. 1065 (1903). Stated somewhat differently, this Court has stated that recovery may be had for "the loss of affection, counsel and advice, the loss of deceased's care and solicitude for the welfare of his or her family and the loss of the comfort and pleasure the family of deceased would have received . . ." *In re Behm's Estate*, 117 Utah 151, 159, 213 P.2d 657, 661, 40 A.L.R.2d 490, 496 (1950). See also *Beaman v. Martha Washington Mining Co.*, 23 Utah 139, 149, 63 P. 631, 632 (1901). Such damages are not limited to the period during which the deceased would have been a minor. *Id.* at 149, 63 P. at 633.

■ To assign a monetary value to loss of comfort, society, love, companionship, advice, and protection in some realistic manner, the trier of fact may consider factors relating to the physical, emotional, and psychological relationship, between the deceased and those entitled to recover, including the kindly demeanor between members of a family. *Pool v. Southern Pacific Co.*, 7 Utah 303, 26 P. 654 (1891). *Cf.* Annot., *Measure of Damages for Wrongful Death of Child Under Federal Tort Claims Act*, 25 A.L.R.Fed. 179 (1975).

Concededly, such losses are difficult to quantify and impossible to fit into a mathematical formula which translates them in any precise fashion into monetary values. But the alternatives raise an even more serious problem. To say that the law recognizes no loss for intangible injuries resulting from a wrongful death is repugnant to basic human values and flouts basic principles of justice. On the other hand, the law does not permit unfettered discretion in awarding damages. Experience demonstrates that juries and judges are able to translate the loss of a child's life into monetary values in a manner which has been generally accepted as reasonable and has avoided grossly disparate damage awards. To be sure, the making of such judgments is not easy and requires great understanding of those human values which can make interpersonal relationships so precious. Yet, the process, difficult as it is, must be tempered and confined so as to strike a just balance. The process is not unique to wrongful death cases.

In this case, plaintiff contends Utah law is too restrictive because it does not permit recovery of all damages actually suffered. Her claim is that she should be recompensed for the cost of rearing her deceased child to the age it had obtained at the time of death. This she calls the "investment theory of damages." In support thereof, she sought to introduce evidence of the average cost of raising a child to the age of five years and one month. She also claims she is entitled to damages based on the "lost opportunity cost" theory of recovery, i.e., the income she lost by devoting her full time to the rearing of her deceased child rather than entering the work force.

As authority for the "investment theory" of damages, plaintiff relies on *Wycko v. Gnodtke*, 361 Mich. 331, 105 N.W.2d 118 (1960). In *Wycko* the controlling Michigan wrongful death statute authorized recovery of damages in a wrongful death action which were "fair and just, with reference to the *pecuniary injury* resulting from such death . . ." Mich.Comp. Laws § 691.581 (1948) [emphasis added]. The Michigan

child killed by the negligent acts of another, has not only been obliterated by time and social changes, but by sound reasoning . . . . While children still frequently contribute to the support of their families, their status in society cannot be measured merely in terms of what they are able to do for the financial aid of their parents. In many cases the cost of rearing children far exceeds all possible earning capacity. Nevertheless, children are sought, not for their financial possibilities, but for love, companionship and happiness which transcend all financial considerations.

Court, in a long line of cases, had restrictively construed that provision to require, essentially, proof of an economic, as opposed to psychological and other non-out-of-pocket losses resulting from the death of a child. Thus the death of a child was measured by the child's "probable wages less the cost of his keep," i.e., what has been termed the "child-labor" standard.[2] 361 Mich. at 338, 105 N.W.2d at 122.

The Michigan court held that the loss of companionship and society was a "pecuniary loss" as that term was used in the Michigan statute. To arrive at that conclusion, the Court employed a standard for calculating the loss which was based largely on values recognizable in the marketplace. The Court analogized a child to a manufacturing plant or industrial machine whose value includes the cost of acquisition, upkeep, maintenance, repair and renovation. On that basis, the court held that the value of the life of a child could be calculated, at least in part, by the expenses of birth, food, clothing, medicines, instruction, nurture and shelter, and companionship, all of which, according to that court, could be acquired in the marketplace. Thus, ironically, the Michigan court in the Twentieth Century viewed a child basically as an economic unit so as to provide judicial relief—the same view also used during the Eighteenth and Nineteenth centuries.

The *Wycko* opinion was widely heralded, but ten years later in *Breckon v. Franklin Fuel Co.*, 383 Mich. 251, 174 N.W.2d 836 (1970), the Michigan Supreme Court reversed the holding in *Wycko* that damages for loss of companionship and society of a child were recoverable and returned to the narrow "child-labor" interpretation of the Michigan wrongful death statute. In *Breckon*, the court held that the term "pecuniary injury" essentially meant out-of-pocket losses produced by the wrongful death of a child. Thereafter, the Michigan legislature, with some degree of alacrity, amended the wrongful death act and expressly provided for recovery of loss of society and companionship, and the Michigan court then overruled *Breckon* as to causes of action arising before that statute became effective. *Smith v. City of Detroit*, 338 Mich. 637, 202 N.W.2d 300 (1972).

It is against that somewhat tortuous background of the Michigan law that we must view the specific standards set out in *Wycko* for calculating damages. Given the restrictiveness of the Michigan statute in 1970, the "investment theory" of damages represented a judicial attempt to ameliorate a restrictive statute. However, the "investment theory" has not been accepted by other courts, even when the controlling statutes refer to "pecuniary losses" as the governing standard. As one court has stated: "... Michigan stands alone in its adoption of the theory that pecuniary loss includes the loss of investment in the child as one of its elements." *Dugas v. National Aircraft Corp.*, 310 F.Supp. 21, 28 (E.D.Pa.1970). See also *D'Ambra v. United States*, 481 F.2d 14, 20 n. 14 (1st Cir. 1973); *Comment,*

---

2. The Michigan court's criticism of the child-labor standard gives a glimpse of the development of the law as to the value of a child's life in the context of changing social conditions. In *Wycko* the court stated, 361 Mich. at 337–338, 105 N.W.2d at 121:

> That this barbarous concept of the pecuniary loss to a parent from the death of his child should control our decisions today is a reproach to justice. We are still turning, actually, for guidance in decision, to 'one of the darkest chapters in the history of childhood.' Yet in other areas of the law the legal and social standards of 1846 are as dead as the coachman and his postilions who guided the coaches of its society through the dark and muddy streets, past the gibbets where still hung the toll of the day's executions. In most areas the development of the law has paralleled the enlightened conscience of our people. Examples abound. We no longer tolerate the intentional infliction of mental suffering. Illness from such cause is not, we now recognize, imaginary. A right to privacy is recognized, haltingly, it is true, but a start has been made. The exploitation of children by avaricious parents and guardians is no longer permitted, much less condoned. A combination of influences, all arising from the public condemnation of child labor, has resulted in almost universal state child-labor and compulsory school attendance laws. In fact, our society, by one means or another, now attempts to keep children out of the general labor market. [Footnotes omitted.]

*A Modern View of Wrongful Death Recovery: Herein of the Infant and the Aged,* 54 N.W.L.Rev. 254 (1959).

If the death of a child were today reckoned solely by the amount of money the child might have contributed to a household, less expenses, there would be no recovery at all in most cases. In this jurisdiction, we recognize that the central loss resulting from the death of a child results in the destruction of those intangible, but nonetheless very real, human relationships in which the blessings of love, society, and companionship are both given and received with benefit to both the giver and the receiver. Though not easily quantifiable, the losses are nevertheless palpable. Indeed, scientific research makes us increasingly aware that the psychic shock produced by the death of a loved one may palpably adversely affect one's physical well being. No longer can we draw a sharp distinction between the psychological and the physical injury.

Certainly the "investment theory" stated in *Wycko* has the virtue of providing a relatively high degree of objectivity and measurability. But the *Wycko* measure of damages fails to focus upon the true loss incurred, namely, the loss of companionship, protection, affection, and society of the child, along with whatever monetary benefits he might have contributed.

The Utah statute has never been as restrictively phrased or construed as the Michigan statute. On the contrary, the statute is broadly phrased, and this Court has construed it accordingly. From an early date the State of Utah recognized that the essential value of a child existed not in its ability to produce wealth. Nor has this Court made the strained analogy between a child and industrial equipment as a method for determining damages. As a price for allowing damages to be assessed for the loss of consortium, we lose certainty and objectivity in the computation of damages, but the law takes that route in an effort to give recognition to the essential nature of the loss.

The discretion of the jury in awarding damages will of course be guided by the evidence adduced, the common sense of the jury, and the values they reflect from the community from whence they come. Various kinds of evidence are likely to have some relevancy in giving appropriate guidance. This Court has previously referred to the kindly demeanor between the members of the family as a relevant factor.[3] *Pool v. Southern Pacific Co.,* 7 Utah 303, 26 P. 654 (1891). See generally Annot., 25 A.L.R.Fed. 179 (1975); 20 Am.Jur. Trials, Damages for Wrongful Death and/or Injury to, Child, 513 (1973). No doubt some, if not all, of the evidence which might be used to prove the "investment theory," may provide helpful guidance. Special kinds of expenditures or sacrifices—whether psychological, monetary, or otherwise—which exceed the ordinary manner of rearing a child and are

---

**3.** Writing generally about the measure of damages in wrongful death cases, this Court stated in *Webb v. Denver & Rio Grande W. Ry. Co.,* 7 Utah 17, 23–24, 24 P. 616, 618 (1890):

But the word "pecuniary" in this connection is not construed in any very strict sense and the tendency is to still greater liberality, and to include every element of injury that may be deemed to have a pecuniary value, although this value may not be susceptible of positive proof, and can only be vaguely estimated. It may include the loss of nurture, of the intellectual, moral, and physical training which a mother only can give to children. *Tilley v. Railroad Co.,* 29 N.Y. 287. It may include the loss of expected services of children who at the time of their death are too young to render any service, (*Ihl v. Railway Co.,* 47 N.Y. 317); or of children or persons

under no legal or moral obligation to render service or support, if the circumstances shown render it probable it will be rendered, (*Railroad Co. v. Bayfield,* 37 Mich. 205; *Railroad Co. v. Barron,* 5 Wall. 90). It may include the loss of the society of a near relative (*Beeson v. Green Mountain, etc., Co.,* 57 Cal. 20), and may include damages for the loss of the father by children who are of full age living away from the home of the deceased and supporting themselves, (*Lockwood v. Railway Co.,* 98 N.Y. 523). The damages, the pecuniary injury, in cases under this statute, cannot be proved with even an approach to accuracy, and yet they are to be estimated and awarded, for the statute has so commanded, and the jury is to give such damages as may be just under all the circumstances.

designed to develop special talents or abilities or provide special opportunities, may be especially helpful.

Such factors do not constitute a separate measure of damage as such, but they may demonstrate the nature of the psychological investment which has contributed to the love and affection which tend to create a bonding of the child and its parents. To that extent such factors may assist in the determination of the monetary amount to be awarded for the loss of love, affection, and society. See generally, Decof, *Damages in Actions for Wrongful Death of Children*, 47 Notre Dame Lawyer, 197 (1971). However, neither the wealth of those entitled to recover nor the expenditure of money, as such, is the touchstone. We emphatically do not mean to imply that the overly-indulgent parent who showers a child with all kinds of material gifts in lieu of parental guidance and love—but with little psychological attachment to the child—has been damaged more than an impoverished parent who has made no such material gifts but has given and received much love and affection.

■ In the instant case, the proffered evidence was the *average* cost of raising a child to the age of five years. It did not constitute proof of any special closeness of the mother and the child—although we have no reason to doubt such a relationship in this case. On the instant facts, we think that the relevance was sufficiently minimal that it was not reversible error to exclude it.

■ Appellant also urges that the jury should have been instructed that she was entitled to the amount of money she could have earned had she not borne her child and instead entered the work force. We are unpersuaded that "lost opportunity" costs constitute a valid measure of damages. No case is cited in support of the proposition; and in our view logic and reason require its rejection. No doubt, the choice of most parents to have children is voluntarily and willingly made. The benefits which most people find in parenthood, even when the life of a child is cut short, can hardly be measured by the pay check obtained by toiling in the marketplace. Moreover, parents in many families, sometimes by choice and sometimes otherwise, both work and rear children. It does not necessarily follow that a parent who works, whether by necessity or otherwise, suffers a greater loss than one who does not. Indeed, it may be that widows, widowers or divorcees who work to maintain their family units may find the loss of a child even more grievous than one not so compelled.

Furthermore, damages for the wrongful death of a child is in reality recompense for a future loss—the loss of future sharing of love, companionship and society. Lost opportunity costs are based on past events and are not therefore a measure of the actual loss sustained. Thus, the theory is not an adequate substitute for measuring that loss.

■ Appellant also contends that the trial court erred in excluding testimony of her inability to bear additional children. Generally, the jury may consider the health of a party seeking recovery for the wrongful death of another. *Evans v. Oregon Shortline Railroad Co.*, 37 Utah 431, 108 P. 638 (1910); *Pool v. Southern Pacific Co.*, 7 Utah 303, 26 P. 654 (1891); *Immel v. Richards*, 154 Ohio St. 54, 93 N.E.2d 474 (1950); *Parkhill Trucking Co. v. Hopper*, 208 Okl. 429, 256 P.2d 810 (1953).

■■ The ability of a mother to bear additional children is a material factor to be considered under the law of Utah in measuring damages. Inability to bear another child may well accentuate the loss of a deceased's love, society, and companionship. The sole evidence proffered in this case to prove plaintiff's infertility was her own testimony of missed menstrual periods. Without expert testimony, however, that evidence was so speculative that it failed to make more probable than not that plaintiff would not be able to bear other children, and had minimal persuasiveness.

Appellant also complains of defendant's closing argument. In closing argument, counsel has wide latitude. Effective argu-

ment may employ various forensic skills designed to persuade a jury to view the evidence with a particular perspective. But the latitude generally permitted ends abruptly when counsel makes statements about facts or propositions of fact pertaining to the dispute which are outside the record. It is as improper to misstate facts in the record as it is to state as facts propositions for which there is no evidence.

■ In this case, defendant did not take the stand, and references to the sorrow of the defendant and the distress he himself suffered in causing the death of a child violated the bounds of proper argument, and that impropriety was compounded by defendant's having admitted the plaintiff's allegations of willful intoxication or willfulness so as to prevent such evidence from reaching the jury. Had the jury been permitted to hear the evidence of liability, it may have totally discounted defendant's self-inflicted sorrow. Although the argument was improper, we do not think that it affected the fundamental fairness of the trial, and reversal is not, therefore, called for because we do not believe a different result would have occurred. *Park City Utah Corp. v. Ensign Co.*, Utah, 586 P.2d 446 (1978); *Wagner v. Olsen*, 25 Utah 2d 366, 482 P.2d 702 (1971); *In re Estate of Ekker*, 19 Utah 2d 414, 432 P.2d 45 (1967).

■ Plaintiff also urges that the district court erred in not admitting evidence concerning the circumstances of the fatal accident and in refusing a proposed jury instruction concerning defendant's alleged willful misconduct or intoxication. However, the rule is well-established that where liability is admitted, evidence going only to liability, in the absence of a claim of punitive damages, is not admissible. *Los Angeles County v. Beverley*, 126 Cal.App.2d 89, 271 P.2d 965 (1954); *Snyder v. General Electric Co.*, 47 Wash.2d 60, 287 P.2d 108 (1955); Annot. 80 A.L.R.2d 1224 (1961).

Finally, we do not believe the trial court transcended its discretion in denying the motion for a new trial or in the alternative an additur.

Affirmed. Costs to respondent.

HOWE, J., and J. ALLAN CROCKETT, Retired Justice, concur.

HALL, C. J., concurs in the results.

OAKS, J., does not participate herein; CROCKETT, Retired Justice, sat.

MAUGHAN, J., heard arguments but died before the opinion was filed.